IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DOYLE HALL,

        Plaintiff,

        v.                                 Civil Action No. 5:08-CV-91

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

        Plaintiff, Doyle Hall, (Claimant), filed a Complaint on April 30, 2008 seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on October 17, 2008.[2] Claimant filed his Motion for Summary Judgment on November 12, 2008.[3]  Commissioner filed his Motion for Summary Judgment on December 10, 2008.[4]

B.    <u>The Pleadings</u>

    1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

    2.    <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 11.

[3] Docket No. 14.

[4] Docket No. 15.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED**.  Substantial evidence supported the ALJ's decision.  Specifically, the ALJ gave sufficient weight to the reliability of Claimant's statements about pain; he properly evaluated the combined effect of all of Claimant's impairments; and he gave sufficient weight to the opinion of Claimant's treating physician.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) and supplemental security income on October 7, 2005, alleging disability since September 30, 2005, due to degenerative disc disease, herniated discs, pinched nerves, and numbness in the legs.  (Tr. 56-58, 73-74, 355-59).  The claims were denied initially on January 19, 2006, and upon reconsideration on July 13, 2006. (Tr. 43, 33).  Claimant filed a written request for a hearing on August 10, 2006 (Tr. 31).  Claimant's request was granted on September 6, 2006 and a hearing was held on June 12, 2007.  (Tr. 27, 361-84).

The ALJ issued an unfavorable decision on July 27, 2007 (Tr. 10-25).  The ALJ determined Claimant was not disabled under the Act because there was a significant number of sedentary jobs in the national economy that he could perform.  (Tr. 13-25).  On August 31, 2007,

Claimant filed a request for review of that determination. (Tr. 8-9). The request for review was denied by the Appeals Council on February 28, 2008. (Tr. 5-7). Therefore, on February 28, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on July 19, 1968 and was thirty-seven (37) years old as of the onset date of his alleged disability. (Tr. 56, 365). Claimant was therefore considered a "younger person" under the age of 45 under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2008). Claimant has a high school education and past relevant work as a welder, laborer and sander (Tr. 23, 74-75, 79, 365-66, 379).

C.    Medical History

The following medical history is relevant to the disposition of the case:

**Summersiville Memorial Hospital, Outpatient Radiology Report, 8/26/2005, (Tr. 148-49)**

MRI of lumbar spine without contrast. The MRI revealed:

1. spondylolisthesis and spondylolysis L5-S1 with grade 1 spondylolisthesis;
2. disc herniations though this may represent pseudodisc due to slippage;
3. severe bilateral neural foraminal encroachment due to disc and anterior slippage creating probable bilateral neural foraminal encroachment at L5-S1 level; and
4. degenerative disc changes at L4-5 and L5-S1.

A neurosurgical consult was recommended.

**Julian Bailes, M.D., Neurosurgical Consult, 11/14/2005, (Tr. 150-55, 267-68, 320)**

Claimant underwent a neurosurgical consult for evaluation of complaints of chronic low back pain radiating to both hips and occasionally down to the left leg, with episodic numbness. Dr. Bailes stated claimant had chronic pain. He further stated the most significant finding was an L5-S1 grade 1 spondylolisthesis which would require a large operation with instrumentation and

bony fusion. Dr. Bailes stated a better recommendation at this time would be a pain clinic evaluation. Claimant followed up with Dr. Bailes on March 19, 2007 with complaints of low back pain, bilateral hip pain, and left leg pain. Dr. Bailes noted his deep tendon reflexes and bilateral S1 tenderness with palpitation. Dr. Bailes recommended Claimant complete his pain management.

## Physical RFC, DDS Physician, 12/13/2005, (Tr. 164-171)

Claimant can occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push/pull unlimited. Claimant can occasionally: climb, balance, stoop, kneel, crouch and crawl. No manipulative, visual communicative or environmental limitations except to avoid concentrated exposure to hazards such as machinery, heights, etc.

DDS Physician disagreed with Claimant's treating physician and found him able to perform a light type of work.

## Mental Assessment of Ability to do Work-Related Activities (Mental) & Psychological Evaluation, Michael D. Morello, M.S., 2/2-2006-2/22/2006 (Tr. 172-180)

Claimant was diagnosed with Depressive Disorder and Anxiety Disorder.

WAIS-III: FSIQ=80; PIQ=79; VIQ=86

Mr. Morello recommended Claimant stay in close contact with doctors for medication management, that he receive health counseling, and referred him to the pain clinic. He noted during his evaluation that Claimant's affect was slightly restricted. Claimant's mini mental status examination found attention and concentration were below average, and that the low academic achievement may interfere with his ability to perform everyday functions. A mental assessment was performed and it was determined Claimant would have a fair ability to relate to coworkers, use judgment, interact with supervisors, function independently, and understand, remember, and carry out simple job instructions. Claimant would have a poor ability to deal with the public, deal with work stressors, maintain attention and concentration, understand, remember, and carry out complex job instructions, understand, remember, and carry out detailed but not complex job instructions. Claimant would have poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.

## Webster County Memorial Hospital, 2/25/2006, (Tr. 181-191)

On February 25, 2006, Claimant reported to the Webster County Memorial Hospital ER due to an allergic reaction to Paxil, which had been prescribed for depression. The ER doctor, Dr. Cutlip, diagnosed depression, Hypertension and dyshydrosis.

## Psychiatric Review Technique, DDS Physician Bob Marinelli, Ed.D., 5/19/2006, (Tr. 198-

**211)**

Medical Disposition - Impairments not severe.

12.04 - Affective Disorders
12.06 - Anxiety Disorders

Claimant diagnosed with depressive disorder and anxiety disorder.

Mr. Marinelli opined Claimant's psychological impairments would have only a mild impact on his activities of daily living, ability to maintain social functioning and maintaining concentration, persistence, or pace.

WAIS-III: VIQ=86; PIQ=79; FSIQ=80

Exam note - comments appear to reflect more severe functional loss than that evident from his Y impairments. Appear to include his reaction to meds and pain secondary to his physical impairments.

## Webster County Memorial Hospital, Dr. Faulkner, 2/9/04-5/25/06 (Tr. 212-234)

Claimant visited Dr. Faulkner on February 9, 2004, complaining of arthritis pain in hands and back pain for six months. Dr. Faulkner noted history of osteoarthritis and decreased range of motion at the lumbar spine. Treatment consisted of Motrin and follow up in one month. Claimant saw Dr. Faulkner on January 28, 2005, complaining of low back problems from an injury one year ago. Claimant stated medications were no longer helping, pain was going down the right leg, and that he feels popping and burning occasionally. Dr. Faulkner noted upper lumbar lordosis at L5-L5, paraspinal spasms greater on the right then left. Dr. Faulkner diagnosed low back pain, lumbago, and obesity. Treatment consisted of prescribing flexaril, celebrex, and recommending weight loss.

Claimant underwent a lumbar spine x-ray which revealed grade two anterolisthesis of L5 on S1 with spondylolysis of the posterior elements of L5. Claimant followed up with Dr. Faulkner on March 4, 2005, for low back pain. Claimant had lost ten pounds per doctor recommendation. Dr. Faulkner treated Claimant with ultracet, celebrex, and recommended further weight loss. During an office visit with Dr. Faulkner on August 8, 2005, Claimant complained of chronic back pain getting worse and not getting therapeutic relief with celebrex. Dr. Faulkner noted Claimant's blood pressure had increased. Treatment consisted of discontinuing celebrex, and starting ultracet. Claimant visited Dr. Faulkner on August 17, 2005 for follow up on back pain. Dr. Faulkner ordered Claimant to start physical therapy two times a week for three months and continue use of arthrotec, MRI of spine, and start Lortab 5/500 once daily.

Claimant followed up with Dr. Faulkner on September 7, 2005 complaining of low back pain. Dr. Faulkner stated Claimant had exaggerated lumbar lordosis with lumbar paraspinal spasms

left greater than right. Dr. Faulkner noted Claimant had decreased sensation to the left lateral thigh, calf, and foot. Dr. Faulkner diagnosed the Claimant with lumbar grade 1 spondylolysis and lumbar radiculopathy. Dr. Faulkner continued treatment with ultracet, celebrex, toradol, and continued order for light duty work. Dr. Faulkner referred Claimant to a neurosurgeon due to the MRI results. On September 28, 2005, Dr. Faulkner stated Claimant is temporarily and totally disabled due to back pain with extensive lumbar disc disease with nerve compression. Claimant visited Dr. Faulkner on October 7, 2005, complaining of low back pain. Dr. Faulkner prescribed Ultracet and Celebrex. Claimant saw Dr. Faulkner on November 9, 2005 for a physical for the West Virginia Department of Health and Human Resources. Dr. Faulkner noted a positive straight leg raise at 40 degrees and left at 20 degrees. Dr. Faulkner also noted muscle spasms at the lumbar spine with right being greater than left with decreased range of motion. Dr. Faulkner further stated the Claimant is not able to work full time and is not to bend, stoop, or lift and is unable to work for at least a year. Dr. Faulkner recommended physical therapy.

Claimant again visited Dr. Faulkner on December 14, 2005, complaining of low back pain radiating to the right buttock to the right lateral thigh. Dr. Faulkner refilled Lortab and prescribed a TENS unit. Claimant had multiple visits with Dr. Faulkner through May, 2006 for severe pain. Dr. Faulkner treated with multiple medications and referrals to the pain clinic.

**Physical RFC, DDS Physician, 7/12/2006, (Tr. 235-242)**

Claimant can occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push/pull unlimited. Claimant can occasionally: climb, balance, stoop, kneel, crouch and crawl. No manipulative, visual communicative or environmental limitations except to avoid concentrated exposure to hazards such as machinery, heights, etc.

DDS Physician disagreed with Claimant's treating physician and found him able to perform a light type of work.

**Davis Memorial Hospital Pain Management Center, Mohamed Fahim, MD, 8/2/2006-1/11/2007, (Tr. 250-65)**

Claimant underwent a consultation with Dr. Fahim complaining of low back pain that radiates to both hips and lower extremities. The left side is more affected than the right. Claimant underwent physical therapy and chiropractic services. Neither was helpful. Dr. Fahim diagnosed lower back pain, degenerative joint and disc disease of the lumbar spine, grade 11 anterior lithithiasis on L5-S1, myofascial pain syndrome of the back, left lumbar facet joint disease, bilateral sacroiliac joint disease, obesity, depression, and hypertension. Dr. Fahim treated with local infiltrative anesthesia injections to the lumbar facet joints, left sacroiliac joint and right sacroiliac joint.

D.    Testimonial Evidence

Testimony was taken at hearing held on June 12, 2007.  The following portions of the testimony are relevant to the disposition of the case:

Q       All right.  Why did you have to quit working?

A       My pain in my back got so bad that I couldn't function, I couldn't hardly get out of bed and I couldn't do the work that I'd done and I took medical leave at that time.

Q       Were you born on 7/19 of '68?

A       Yeah.

Q       How old are you?

A       38.

Q       And you're a high school graduate?

A       Yes.

Q       Were you ever in the military service?

A       No.

Q       What's your height and weight these days?

A       About 5'6", 272 or 4.

                        *                   *                   *

Q       Can you drive a car these days?

A       No, I don't drive.

Q       Why not?

A       I can't see very good with the medications that I take.  I get dizzy.

Q       You can't see?

A       My medications messes with my eyes and leg spasms.

Q    Do you and your wife have any children under 18?

A    Yes.

Q    How many?

A    I have two boys that's mine and she has a boy and a girl that's hers.

Q    So there are four children in the family?

A    Yes.

*          *          *

Q    You suffer from degenerative disk disease and spondylolisthesis of the low back, right?

A    Yes.

Q    And that's very painful?

A    Oh, yeah, it's rough.

Q    How often - - is the pain constant?

A    The pain is constant.

Q    How severe is it?

A    It's chronic pain.

Q    Okay.  Let me ask you on a pain scale of one to ten, with taking your medication and on a normal day where would you place the pain on your back?

A    Eight or nine.

Q    Okay.

A    Them spasms.

Q    Okay.  And what do you take for pain?

8

A       Kadian, it's Morphine Sulfate.

Q       That's essentially Morphine?

A       Yes.

Q       Does it have any side effects on you?

A       Yeah, it messes with my eyes, dizziness.

ALJ       Excuse me, what's that medicine called?

ATTY       Kadian, it's Morphine Sulfate.

ALJ       Okay.  It's not on this list here you sent us.  Did you send a medicine sheet?

ATTY       Yes, it's the first one on the one that we thought was in.

ALJ       When was that sent in?

ATTY       Very recently. I would resubmit it, this is an updated list, right, the one we done?

CLMT       I believe so.

ALJ       Okay.  Let's fax that over here.  Do you take Oxycontin?

CLMT       No.

ALJ       Well if this stuff is making you blind why do you take it?

CLMT       For the pain.

ALJ       Well did you ever tell your doctor you can't see when you take it?

CLMT       Yeah, but they think that the benefits out weighs the risk, if I would quit taking it she said my vision would straighten up.

*            *            *

9

Q       Okay.  If you don't have your pain reliever, what kind of pain do you have?

A       It's unbearable.

Q       What do you have to do?

A       Just you live in pain, you know, muscle relaxers and things like that don't really help with the pain but the Morphine it does keep it under control to a certain point.

Q       Do you have headaches?

A       Yeah.

Q       What causes them?

A       My medications.

Q       They're called Morphine headaches sometimes?

A       Yeah.

Q       How often do you get those?

A       A couple times a week usually.

Q       Okay.  Have you been in a wheelchair?

A       I have a couple times when I went to the hospital where I just couldn't walk. They had to take me in.

Q       Do you use any walking devices?

A       I've got an old cane I use when I'm having spasms real bad and sometimes I use it.

Q       Do you have it with you today?

A       Yes.

Q       When you mentioned spasms, describe what they're like?

A        It's just a muscle spasm that usually starts either in your hips or the back of your legs, burn and just big muscle knots all the way up and down the back of your legs.

Q        How often do you get those?

A        Two to three times a day.

Q        And what do you do for them?

A        I use muscle rub, TNS units, different muscle relaxers and heat.

Q        Okay.  Put hot stuff on it, heat?

A        Yeah, heating pads and things like that.

Q        How long will one last, on average, give us an idea?

A        Two to three hours. They don't really stop them, they make it to where you can tolerate them a little bit.

Q        Okay.  When you took medical leave did the doctor ever tell you you could return to work?

A         He told me we would see at that time and then he told me that if I continued working that I would do more damage, you know, with the degeneration I was really going to hurt myself a lot.

Q        Did he - - maybe I ought to ask another way, have any doctors placed any restrictions on you, things you can't do or should avoid?

A        Yeah, he told me not to be, you know, lifting and pulling and tugging, you know, and pushing on things.  He told me I really had to watch when I walked not to fall, I'll do more damage to the vertebrae and things in my back.

*                *                *

Q       Have you been treated for depression?

A       Yeah, I take an anti-depressant.

Q       Have you seen a counselor?

A       I'm going to see one at the end of the month, they got me an appointment.

                    *               *               *


Q       Do you have any hobbies you're able to do now?

A       No.

Q       Who does the cooking and cleaning?

A       My wife and her mother.

Q       And who does the shopping?

A       Kim, she does.

Q       How about the outside work, yard work?

A       My oldest boy he does the mowing and the other two boys they weed eat.

Q       Have you been told not to drive or you just don't do it?

A       Yes.

                    *               *               *

Q       Okay.  Are you a member of any clubs, groups, churches?

A       No.

Q       Do you have friends that come over or you visit them?

A       No.

Q       Talk on the phone much?

A       I talk to my mother every once in awhile on the phone.

Q       Have you gained or lost much weight?

A       I've gained a lot of weight.

Q       Okay.  I think - - what's your height?  I think we asked your height and weight.
How much do you weigh now?

ALJ     5'6" and 270.

                        *               *               *

Q       Do you have trouble concentrating or thinking?

A       Yeah.

Q       What's some examples?

A       Watching TV is about useless, I forget things and I need to talk to the pharmacy
or something, she'll write it down or call me or just call herself, you know.

Q       Do you have sleep problems?

A       Yeah.

Q       What's your normal sleep pattern, when you do go to bed and get out?

A       I usually - - I go to bed probably 10:30 to 11:00 and actually fall asleep, 1:00,
2:00 and usually wake up 8:00 or 9:00 in the mornings.

Q       What do you do on a normal day, let's start with when you get up, about 8:00 or
9:00, what do you do?

A       Well, I'll usually lay there in the bed and move my legs and things about trying to
get limbered up and I'll get up on the edge of the bed and if I'm having spasms I'll put muscle
rub on it and get into the bathroom there and get my medicine.

*          *          *

Q          Are you able to help get the children off to school?

A          No.

Q          Okay.

A          She drives them down to the bus stop.

Q          Okay.  What do you do after that?

A          I usually will sit there in my chair and drink my coffee and watch TV and I take my pain medicine and that's about the end of that day.  You know, just bits and pieces fall together.

Q          Do you lie down?

A           In my recliner, sometimes - - well sometimes I have to lay straight down on my heating paid and stretch out.

*          *          *

Q          How long can you sit at a time?

A          Five, ten minutes is about the most, I've got to get up and stretch around and I stand very long and then I sit down, you know.

Q          How about standing, about how long?

A          If I just have to stand just a couple minutes, I can lean on something and do fairly well for a few minutes.

Q          Do you have to have a cane or something or wall?

A          Sometimes when I take the first few steps I'll use my cane if my legs are spasm.

*          *          *

Q        Okay.  How far can you walk on a level, say in terms of yards?  I might help to imagine - -

A        Twenty-five, thirty feet.

Q        Twenty-five, thirty feet?

A        Yeah.

Q        Okay.

A        If I stop a little bit or if I ain't already walked and walked and walked, you know, not a whole lot.

Q        Do you have any problems with bathing, dressing?

A        Sometimes I'll get real stiff and sore and she'll have to help me.

Q        Kim helps you?

A        Yeah.

Q        How much can you lift?

A        I ain't for sure.

Q        What's the heaviest thing you do lift?

A        Maybe a jug of milk.

Q        Weight about eight pounds then?

A        I believe.

Q        Okay.

A        That's about it.

Q        What's the most comfortable position for you?

A        In my recliner.

Q        Okay.

A        Lean back with the heating pad.  I go through a lot of heating pads.

*                *                *

RE-EXAMINATION OF CLAIMANT BY ATTORNEY:

Q        Yes.  Does anyone help you during the day when your wife is working?

A        Yes, my mother-in-law, she fixes my lunch and stuff like that and hands me things and stuff.

*                *                *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        Can you classify his prior work for us?

A        Your Honor, according to 5E the claimant worked as a welder with three different time periods from 2000,  2005, that was at a saw mill, medium, it's considered to be skilled work.  '99 to 20 for a construction company at a saw mill, again medium, skilled work.  '97 to '98 at a coal plant, medium, skilled work.  He worked as a laborer for a maintenance contractor between '96 and '97, that's going to be heavy, unskilled work.  And then he worked as a sander at a furniture plant between '90 and '96, light, unskilled.

Q        Would any of those skills transfer to sedentary work?

A        No, sir.

Q        Hypothetically given this gentleman's age and his educational background, if he had to have a sedentary job with a sit/stand option at the work station, no driving, what kind of jobs would there by hypothetically?

A        Material handler positions would be a possibility, sedentary, unskilled, in West

Virginia there are over 300 positions, in the US over 43,000. General production worker, sedentary, unskilled, over 350 in West Virginia, over 61,000 in the US.

Q      Are those jobs consistent with the DOT?

A      Yes, sir.

Q      Now, if somebody were in pain where they couldn't get up and go to work on a regular basis, couldn't even concentrate on these simple, unskilled jobs that you mentioned, perhaps had to miss two or three days a month due to pain, could they do any of those jobs?

A      No, sir.

Q      But if somebody's pain were controlled or less where even though they were under some pain or discomfort they could get up and go to work and do the jobs that you mentioned, may be would miss only one day a month, would they be able to do those jobs?

A      Yes, sir.

Q      So the pain is going to be a matter of degree?

A      Correct.

                              *              *              *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q      Okay. If the person had muscle spasms that required between two and three hours every day that he could not concentrate due to the pain, are there any jobs that would work around that at the level we're talking, at the sedentary sit/stand option?

A      Not if this were occurring during work hours, no, sir.

Q      Okay. Also, let me try this again, Your Honor, the exhibit from Chameleon Healthcare has - -

ALJ          5F.

ATTY        5F.  I believe has an attachment to it.

ALJ          That is the attachment.

BY ATTORNEY:

Q      Okay.  That's a mental assessment.  I would like you to look at 5F.

ALJ          Okay.

BY ATTORNEY:

Q      And make the assumptions based - - the definitions are on the first page, and then I would like you to assume a person had the limitations set forth in this exhibit in addition to the physical limitations originally given.

A      There would be no jobs based on - -

ALJ    Why would you say that?

VE     - - 5F.  Because of poor ability to maintain attention, concentration.

ALJ    What does poor mean?

VE     Seriously limited but not precluded.  Demonstrate reliability and behave in an emotional, stable manner.

ALJ    Okay.

BY ATTORNEY:

Q      Is there a cumulative effect of all those?

A      Well there would be but, you know, one of the key components of working is reliability, an individual being able to show up, regular attendance.

ALJ    You know, this one he has, Mr. Morello (Phonetic) has the GAF of 63 in page 9.

ATTY        Right.

ALJ        What do you think about that?  That's not even moderate.

ATTY        I think there is some psychological problems but pain and - -

ALJ        But he says he has a depressive disorder not otherwise specified.

ATTY        Right.

ALJ        I think Mr. Morello just marked poor, you know, regardless of the GAF score.  He had three cases today, one he had a 50, one he had a 55 and one he had 63 and Mr. Morello marks poors for all three of them.

ATTY        There might be an explanation here, a lot of psychologists are now considering pain as something that they look at, and this case involves a lot of pain in addition to some mild depression.  So, I mean, that would be my - -

ALJ        That's part of the pain deal.

ATTY        And the things he marked goes right along with what you would expect from the pain as well in this particular case, attention, concentration, reliability.  So I wonder if he's not - - I don't know the answer to this, but it's possible - -

ALJ        I don't know either.

ATTY        - - that he's factoring that in as a part of psychological in addition to the depression.

ALJ        Let me see what he says here.  Well he talks a lot about his pain in this report.

ATTY        Yes.  Which somehow is kind of in between the fields of physical and psychological.

ALJ          Well, you know, we've got a book here in Newsweek this week about pain, you know, and you know, it's - - well, it's hard for people to get a - - it's not like an x-ray, you know that.

ATTY         Right.

ALJ          MSE, what does that mean?  Oh, mental status exhibit, right?

ATTY         Right.

ALJ          Well it says his attention and concentration were measured below average on the mental status.  Okay.  Did you have anything else?

ATTY         Nothing further.

*         *         *

E.     <u>Lifestyle Evidence</u>

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how claimant's alleged impairments affect her daily life:

•     Watches television (Tr. 88, 375).

•     Uses cane to stand and walk (Tr. 376).

•     Overweight (Tr. 154, 265).

### III.  The Motions for Summary Judgment

A.     <u>Contentions of the Parties</u>

Claimant contends that the ALJ made three errors: 1) he erred in not giving sufficient weight to the reliability of Claimant's statements about pain; 2) he erred by failing to properly evaluate the combined effect of all of Claimant's impairments; and 3) he erred in not giving sufficient weight to

the opinion of Claimant's treating physician and psychologist.

Commissioner maintains that substantial evidence supports the ALJ's decision that Claimant's impairments did not prevent him from performing a significant number of sedentary jobs. Specifically, Commissioner argues that Claimant's contention that the ALJ failed to accord sufficient weight to evidence that Claimant suffered from severe pain due to spondylolisthesis is without merit because the law does not require a finding of "objective evidence of pain," but rather that the ALJ must undertake a "threshold test" to determine if there is evidence of "a determinable underlying impairment" that could cause the pain alleged. See Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Commissioner also avers that the ALJ carefully considered Claimant's subjective allegations of pain as well as all of the objective medical evidence. Lastly, Commissioner argues that substantial evidence supports the ALJ's conclusions with regard to Claimant's alleged mental impairments. Commissioner points out that Claimant did not allege a mental impairment in his initial disability application (Tr. 43, 73), but maintained at the hearing that he had been treated for depression. (Tr. 372). Commissioner maintains that the ALJ's conclusion that the Claimant has a "non-severe" mental impairment was justified.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party

opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to

make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    Social Security - Scope of Review - Weight Given to Relevant Evidence. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform his past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If the Claimant does not

have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the Claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.  Social Security - Substantial Evidence - Listed Impairment.  In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment.  Cook, 783 F.2d at 1168.  The ALJ must identify the standard to be applied.  Id. At 1173.  The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts.  Id.

11.  Social Security - Listing.  The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook , 783 F.2d at 1168.  Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases."  Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[5]  In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence.  Gordon, 725 F.2d 231.  See also Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980).

12.  ALJ's Duty to Inquire Into the Evidence.  "[T]he ALJ has a duty to explore all

---

[5]  This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

relevant facts "[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981). See also Cook v. Heckler, 783 F2d 1168 (4th Cir. 1986). When failure to inquire into the additional evidence is prejudicial to the Claimant then the case should be remanded. Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980).

13. Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

14. Social Security - Treating Physician - Opinion that Claimant is Disabled. An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927. A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability. Id. No special significance will be given to the source of an opinion on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

15. Social Security - Treating Physician - Speculative Opinion. An ALJ is not bound

to accept the opinion of a treating physician which is speculative and inconclusive.  <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

16.     <u>Social Security - Treating Physician - Not Entitled to Controlling Weight</u>.  When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization.  20 C.F.R. §§ 404.1527(d), 416927(d).  When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s).  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

17.     <u>Social Security - Claimant's Credibility</u>.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) citing <u>Tyler v. Weinberger</u>, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  <u>See</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'"  <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990).

18.     <u>Social Security - Claimant's Credibility - Pain Analysis</u>.  The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence

an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996).

19.	<u>Evidence Considered in Evaluating the Intensity and Persistence of Claimant's Symptoms and Determining the Extent to Which Claimant's Symptoms Limit Her Capacity for Work</u>.  The Commissioner will take into account all of the following information when assessing a Claimant's subjective complaints of pain: information that Claimant, Claimant's treating or examining physician or psychologist, or other persons provide about Claimant's pain or other symptoms; any symptom-related functional limitations and restrictions which Claimant, Claimant's treating or examining physician or psychologist, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence; all of the evidence presented, including information about Claimant's prior work record, Claimant's statements about her symptoms, evidence submitted by Claimant's treating physician or psychologist, and observations by our employees and other persons; and factors relevant to Claimant's symptoms such as, (i) daily activities, (ii) location, duration, frequency and intensity of pain and other symptoms, (iii) precipitating and aggravating factors, (iv) type, dosage and side effects of pain medication Claimant takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, Claimant receives or has  received for relief of pain or other symptoms, (vi) any measure Claimant uses or has used to relieve pain or other symptoms, and (vii) other factors concerning Claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

20.	<u>Mental Disorders</u>.  The evaluation of disability on the basis of a mental disorders

requires the documentation of a medically determinable impairment(s) as well as consideration of the degree of limitation such impairment(s) may impose on the individual's ability to work and whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. 20 C.F.R. Pt. 404, Subpt P, App. 1, Listing 12.00.

21. <u>Social Security - Residual Functional Capacity</u>. A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. <u>Id</u>. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. <u>Id</u>. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. <u>Id</u>. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. <u>Id</u>. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. <u>Id</u>.

22. <u>Social Security - Vocational Expert</u>. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform. 20 C.F.R. §§ 404.1520(f), 416.920(f).

23. <u>Social Security - Vocational Expert - Hypothetical</u>. In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly

set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).

The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No.

98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[6], and need only pose those that are based

on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861

F.2d 536, 540-41 (9th Cir. 1988).

24.    Vocational Expert Purpose.  "The purpose of bringing in a vocation expert is to

assist the ALJ in determining whether there is work available in the national economy which the

particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at

*4 (4th Cir. Apr. 19, 1996).  "[R]equiring the testimony of a vocational expert is discretionary."

Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

25.    Social Security - Vocational Expert - Hypothetical - Claimant's Counsel.  Based

on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in

hypothetical questions suggested by a claimant's counsel, even though these considerations are

more restrictive than those suggested by the ALJ.  France v. Apfel, 87 F. Supp. 2d 484, 490 (D.

Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

C.    Discussion

1.    The ALJ Erred in Not Giving Sufficient Weight to the Reliability of the
       Claimant's Statements About Pain

Claimant argues that the ALJ, in finding that his testimony regarding the intensity and

severity of his pain was exaggerated, failed to address the findings about the severity and

persistence of pain found by Claimant's treating and evaluating sources.  Claimant argues that

_____

[6] See FN 8.

three doctors, Drs. Bailes, Fahim and Faulkner all found him to have back pain. Claimant argues his statements regarding his pain should have been found to be credible, thus triggering the VE's finding that there are no jobs he could perform given his pain.

Commissioner argues that substantial evidence supports the ALJ's findings regarding the Claimant's subjective complaints of pain.

Claimant's argument is without merit. The Fourth Circuit has laid out the standard for evaluating a claimant's subjective complaints of pain in Craig, 76 F.3d at 585. Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id. However, subjective symptoms "may not be dismissed merely because objective evidence of the pain itself . . . are not present to corroborate the existence of pain." Id.

As the Claimant correctly points out in his brief, the ALJ complied with the first step of Criag by expressly considering whether Claimant has impairments that could cause the symptoms alleged. The ALJ found that there was an objective basis for the Claimant's pain. In his "Findings of Fact and Conclusions of Law," the ALJ found that the Claimant had the following severe impairments: lumbar spondylolisthesis and obesity. (Tr. 15). In so finding, the

ALJ recognized that Claimant has an "underlying impairment" that could cause pain and that would significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, the ALJ fulfilled the first step in the Craig analysis. Upon making this threshold finding, the ALJ must next consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled in accordance with the second prong of the Craig test. Craig, 76 F.3d at 595.

The ALJ determined that Claimant's impairments could "reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 21). Specifically, the ALJ found that "[a]lthough [claimant's] alleged limitations may cause him to perform tasks more slowly, he is able to perform work with appropriate treatment in an appropriate work setting." (Tr. 22).

The crux of Claimant's argument is that the ALJ failed to address the findings about severity and persistence of pain found by the Claimant's treating and evaluating sources. Specifically, Claimant points to the opinions of Dr. Bailes, a treating neurosurgeon who found Claimant to have low back pain and myofascial pain syndrome, Dr. Fahim, an evaluating source who made similar findings and Dr. Faulkner, the initial treating physician who diagnosed back pain with extensive lumbar disc disease with nerve compression and paraspinal spasms. Claimant's argument is without merit, however.

When the ALJ considered Claimant's subjective complaints of pain at the second step of Craig, he noted:

> The claimant testified that he does no cooking, housework or cleaning, but that his mother-in-law helps when his wife is at work; yet his wife works fulltime and he has

four children. These facts are inconsistent, require a stretch of the imagination, and are not credible. He alleged that the last injection put him into a wheelchair for four days, yet this is not documented in the medical record. In March 2007, the neurosurgeon reported that the claimant's gait and station were normal, deep tendon reflexes were all +1, and sensory examination was grossly intact. The claimant had negative straight-leg raising test bilaterally and motor examination was 5/5 although back examination showed some tenderness of bilateral SI joints to palpation. Dr. Bailes again recommended that the claimant pursue pain management treatment. Clearly, the claimant is over-weight which contributes to his back disorder and level of pain. He is taking a lot of heavy medications, some apparently from different physicians, including through the emergency room, as well as Dr. Faulkner. It is concluded that the claimant's complaints of pain are exaggerated and that, although he may have some pain, the pain is not totally debilitating because he shops, performs at least some household chores, visits, and drives. His complaints are inconsistent with his doctors' records, with objective laboratory studies, and with his physicians' notes regarding his reports to his treating physicians. As detailed above, his testimony regarding the severity, chronicity, and debility of his back pain, diagnoses, and treatment is exaggerated, is not credible, and undercuts his credibility with respect to the extent of his functional limitations.

(Tr. 22). Clearly, the ALJ considered Claimant's subjective complaints of pain, as well as all of the objective medical evidence.

2. The ALJ Erred by Failing to Properly Evaluate the Combined Effect of all of Claimant's Impairments

Claimant argues that he is entitled to an evaluation of the combined effect of all of his impairments. Specifically, Claimant argues that the ALJ failed to consider his psychological limitations and the impact of it on his ability to work. Claimant argues that there is substantial evidence that psychological problems exist.

Commissioner argues that the Claimant failed to claim a mental impairment on his initial disability application. Furthermore, Commissioner maintains that substantial evidence supports the ALJ's conclusions with regard to Claimant's alleged mental impairments.

The Court agrees with Claimant that psychological problems are present. However, 20 C.F.R. § 404.1520 states that if a person has a severe impairment and is not engaging in

substantial gainful activity, a disability claim will be granted if the claimant has an impairment

or combination of impairments that either meets or equals the criteria of an impairment listed in

Appendix 1.  The ALJ is required to compare the symptoms, signs and laboratory findings of the

impairment, as shown in the evidence, with the medical criteria for the listed impairment.  20

C.F.R. § 404.1526(a).  Medical equivalents can be found if the medical findings are at least

equal in severity and duration to the listed findings.  Id.  Medical equivalents must be based on

medical findings, and must be supported by a medically acceptable clinical and laboratory

diagnostic techniques.  20 C.F.R. § 404.1526(b).

 In his decision, the ALJ recognized that a combination of impairments can be considered

severe enough to meet or medically equal the criteria of an impairment listed in Appendix 1.

(Tr. 16).  He listed lumbar spondylolisthesis and obesity as severe impairments.  (Tr. 15).  The

Claimant "bears the burden of production and proof during the first four steps of the inquiry."

Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

 The ALJ found that "claimant's medically determinable mental impairment of depression

does not cause more than minimal limitation in the claimant's ability to perform basic mental

work activities and is therefore non-severe."  (Tr. 16).  In making this finding, the ALJ

considered the four broad functional areas set out in the disability regulations for evaluating

mental disorders in 12.00C of the Listing of Impairments.  20 C.F.R., Part 404, Subpart P,

Appendix 1.  He found that "claimant's medically determinable mental impairment causes no

more than 'mild' limitation in any of the first three functional areas and 'no' limitation in the

fourth area, it is non-severe."  20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).

 In this case, the Claimant failed to present adequate medical evidence to support his

assertion that his psychological impairments combine with his other impairments to create a severe impairment. Therefore, substantial evidence supports the ALJ's conclusion and he did not err when he found that Claimant's combination of impairments did not restrict his ability to work.

       3.      <u>The ALJ Erred in Not Giving Sufficient Weight to the Opinion of Claimant's Treating Physician and Psychologist</u>

Claimant cites <u>Adomo v. Shalala</u>, 40 F.3d 43 (3rd Cir. 1994) to support his argument that more weight must be accorded to the reports and opinions of treating physicians than the weight accorded to the opinion and reports of consulting physicians who examined Claimant only once. Claimant further argues that there were no evaluating physicians who examined him and made findings about his limitations or RFC. Dr. Faulkner, however, treated him throughout the relevant period and found Claimant to be unable to work due to back pain with extensive lumbar disc disease with nerve compression.

Commissioner does not respond specifically to this argument.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). While the credibility of the opinions of the treating physician is entitled to great weight, it will be disregarded if there is persuasive contradictory evidence. <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984). To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Heckler v. Campbell</u>, 461 U.S. 458, 461 (1983); 20 C.F.R. § § 404.1508; <u>Throckmorton v. U.S.</u>

<u>Dep't of Health and Human Services</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990).

When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled, the determination or decision, "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. In addition, when not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighted according to the following five factors: 1) length of the treatment relationship and frequency of examination, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization. 20 C.F.R. § 404.1527(d).

In this case, Dr. Faulkner treated Claimant throughout the relevant period and found he was unable to work due to back pain with extensive lumbar disc disease with nerve compression. Dr. Faulkner also prescribed medications for treatment of psychological problems.

After reviewing the records, this Court will consider Dr. Faulkner to be a treating source. A treating source is defined as a physician who provides a patient with medical treatment or evaluation and has an ongoing relationship with the patient. <u>See</u> 20 C.F.R. § 404.1502. When the medical evidence establishes that the patient sees the physician with a frequency consistent with accepted medical practices for the type of treatment required, an ongoing treatment relationship is deemed to exist. <u>See</u> <u>Id.</u>

The ALJ noted in his decision that Dr. Faulkner's November, 2005 finding that Claimant was unable to work full time since he was unable to lift, bend or stoop. (Tr. 17). The ALJ also

outlined Dr. Faulkner's findings and conclusions from his visits with Claimant throughout 2006. (Tr. 19). The ALJ clearly addressed Dr. Faulkner's opinion in his decision and determined it was not entitled to controlling weight. In this case, the ALJ correctly concluded that Dr. Faulkner's opinions were not entitled to controlling weight because there was persuasive contradictory evidence.

The ALJ, in addressing whether to give Dr. Faulkner's opinion(s) controlling weight, stated the following:

> Even though Dr. Faulkner is a treating source by virtue of having treated the claimant on many occasions, this opinion that the claimant is "disabled" is an opinion on an issue reserved to the Commissioner and in this case is not entitled to controlling weight or special significance. In this case, Dr. Faulkner provided the reason for the opinion: a long-term treatment of the claimant for back pain. However, Dr. Faulkner's opinion conflicts with the records of his treatment. These records include observations regarding claimant's response to medical treatment and a high level of pain medication. However, this opinion is wholly inconsistent with the degree of limitation expressed in the doctor's opinion. Therefore, I conclude that Dr. Faulkner's opinion cannot be adopted. Because the evidence of record does not establish that the claimant is disabled as defined in the Act, I cannot accept Dr. Faulkner's opinion that the claimant is disabled. (20 C.F.R. §§ 404.1527(e), 416.927(e); Social Security Ruling 96-5p). (Tr. 22).

In this case, the ALJ found Claimant "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 24). The ALJ's decision to discard Dr. Faulkner's opinions is supported by other evidence in the record, and the rejection of his findings meets the requirements of SSR 96-2p. The ALJ detailed the level of weight he gave to Dr. Faulkner's opinions and his reasoning for the decision. The ALJ also weighed Dr. Faulkner's evidence according to the five factors described in 20 C.F.R. § 404.1527(d)(2). SSR 96-2p states, "[t]reating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527..." The ALJ noted that Dr. Faulkner had a "long-term"

treatment relationship with Claimant for back pain. The ALJ found that Dr. Faulkner's opinions weren't supported by the evidence of record. The ALJ found Dr. Faulkner's opinions to conflict with his own treatment records. The ALJ's decision was supported by substantial evidence; therefore, the ALJ did not commit reversible error when he accorded Dr. Faulkner's opinions less than controlling weight.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED**. Substantial evidence supported the ALJ's decision. Specifically, the ALJ gave sufficient weight to the reliability of Claimant's statements about pain; he properly evaluated the combined effect of all of Claimant's impairments; and he gave sufficient weight to the opinion of Claimant's treating physician.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: February 11, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE